## IN THE U.S. DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

DYNAVOX GROUP AB f/k/a TOBII DYNAVOX AB, and TOBII DYNAVOX LLC,

Plaintiffs,

v.

ABLENET, INC.,

Defendant.

Civil Action No.: _____

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs Dynavox Group AB f/k/a Tobii Dynavox AB, and Tobii Dynavox LLC (collectively, "Plaintiffs" or "Tobii Dynavox"), by and through their undersigned counsel, DLA Piper LLP (US) and Greene Espel PLLP, bring this Complaint for Damages and Injunctive Relief against Defendant AbleNet, Inc. ("Defendant" or "AbleNet") and in support thereof aver as follows:

### INTRODUCTION

1.    Tobii Dynavox is the world's preeminent provider of augmentative and alternative communication ("AAC") devices and software for individuals with speech, language, and motor impairments. Its technologies, in line with its corporate ethos, literally give a voice to those who may not otherwise be able to speak.

2.    Among Tobii Dynavox's offerings is TD SNAP®, a proprietary speech-generating software application protected by federal trademark registration and multiple copyright registrations. Tobii Dynavox makes TD SNAP available to end-users through

app stores pursuant to a license agreement that expressly prohibits the transfer, resale, or redistribution of the software.

3.     Defendant AbleNet, Inc. is a competing assistive-technology company. Unlike Tobii Dynavox, AbleNet does not develop its own speech-generating software. Instead, AbleNet has engaged in a brazen, years-long scheme to exploit Tobii Dynavox's TD SNAP software for AbleNet's own commercial benefit. As set out in this Complaint, AbleNet has accomplished this by, amongst other things, loading TD SNAP onto AbleNet-branded devices and selling those devices to end-users, thereby diverting would-be Tobii Dynavox customers and free-riding on Tobii Dynavox's substantial investment in its technology.

4.     When Tobii Dynavox took steps to curb this misconduct—including by issuing cease-and-desist letters and changing its pricing model—AbleNet simply devised new workarounds, including providing end-users with Apple iTunes gift cards and detailed instructions to download TD SNAP onto AbleNet devices themselves.

5.     AbleNet's misconduct has caused severe harm to Tobii Dynavox, both in terms of improperly diverted sales from Tobii Dynavox to AbleNet and consumer confusion and frustration created by the false impression fostered by AbleNet that it is in some way affiliated with or authorized by Tobii Dynavox.

6.     In order to halt AbleNet's misconduct and preserve patient access to Tobii Dynavox's life-improving technology, Tobii Dynavox brings this action for (1) tortious interference with economic relations; (2) violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*; (3) federal common law trademark

infringement under 15 U.S.C. § 1125(a); (4) federal trademark infringement under 15 U.S.C. § 1114; and (5) unjust enrichment.

## THE PARTIES

7.      Plaintiff Dynavox Group AB f/k/a Tobii Dynavox AB, is a company organized and existing under the laws of Sweden. Its registered office is located in Danderyd, Sweden. On or about June 27, 2024, Tobii Dynavox AB changed its name to Dynavox Group AB.

8.      Plaintiff Tobii Dynavox LLC is a limited liability company organized under the laws of the state of Delaware. Its sole member is Dynavox Group AB.

9.      Upon information and belief, Defendant AbleNet, Inc. is a corporation organized under the laws of the state of Minnesota. Its principal place of business and headquarters are located in Ramsey County, Minnesota.

## JURISDICTION & VENUE

10.     This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 because the case arises, in part, under 15 U.S.C. § 1114 and § 1125(a), and under 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the value of Tobii Dynavox's claims against AbleNet exceeds $75,000.

11.     This Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367 because such claims are so closely related to the claims brought pursuant to 15 U.S.C. § 1114 and § 1125(a) that they are part of the same case and controversy.

12. In addition, this Court has personal jurisdiction over AbleNet because AbleNet has the required minimum contacts with this forum to establish general personal jurisdiction.

13. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Minnesota.

## FACTS COMMON TO ALL COUNTS

### *Background on Tobii Dynavox*

14. Tobii Dynavox is an assistive-technology company that specializes in the research, design, development, manufacture, and global distribution of communication and access solutions for individuals with speech, language, and motor impairments.

15. Tobii Dynavox has become the world's preeminent provider of augmentative and alternative communication devices and associated software, as well as the support and services surrounding those products.

16. The corporate mission of Tobii Dynavox is "giving people a voice." This ethos reflects a broader commitment to universal access, inclusion, and the empowerment of individuals with disabilities to participate fully in education, employment, and social life.

17. Tobii Dynavox's market includes children and adults who, owing to conditions such as (but not limited to) amyotrophic lateral sclerosis (ALS), cerebral palsy, aphasia, autism spectrum disorder, traumatic brain injury, spinal cord injury, Rett syndrome, Down syndrome, or developmental disabilities, cannot rely on natural speech to meet their daily communication needs.

18.    Within this population, Tobii Dynavox serves two principal customer segments: (i) medically complex users who require eye-tracking or alternative non-touch access methods for device interaction, and (ii) non-verbal users with varying levels of cognitive function—often including children—who benefit from symbol-based, touch-enabled communication systems.

19.    Ancillary market participants include speech-language pathologists, occupational therapists, physical therapists, rehabilitation hospitals, schools with the capacity to assist students with special needs, veteran-affairs hospitals, and third-party payers such as Medicare, Medicaid, private insurers, and foreign national health services. All of these ancillary market participants act as influencers or payors in the procurement process.

20.    Tobii Dynavox's product portfolio is anchored by dedicated, speech-generating devices that meet U.S. Food and Drug Administration (FDA) specifications for durable medical equipment pursuant to 42 U.S.C. § 1395x(n).

21.    These products offer a full suite of tools that assist individuals with communication and mobility challenges in leading fuller, richer lives by enabling more seamless communication with their loved ones, friends, healthcare providers, educators, and others with whom they interact.

22.    Tobii Dynavox's products accomplish this goal by deploying cutting-edge assistive technologies across multiple user modalities. These include eye-tracking, which allows individuals with physical or cognitive disabilities to control a computer with their eyes instead of a traditional keyboard and mouse; touch, which allows users to control

computers with their hands; and a "switch" modality, which facilitates speech by allowing users to select from a cycling list of words and images.

23. Some of Tobii Dynavox's cutting-edge products also integrate multiple alternative communication modalities, including symbol-based, text-based, and alternative-access communication technologies to support effective and enriched user interaction.

24. Tobii Dynavox devices are engineered for durability. Many of the devices feature integrated protective crash cases, Gorilla Glass 5 touchscreens, and water-resistant designs. The devices also incorporate high-performance batteries capable of delivering more than ten hours on a typical use, including in outdoor environments.

### *TD SNAP*

25. In addition to its many device offerings and in keeping with its ethos of ensuring all people have a voice, Tobii Dynavox also offers its own application, TD SNAP, for download through the Apple App Store and elsewhere.

26. As an introduction to Tobii Dynavox's capabilities, Tobii Dynavox makes TD SNAP available for download onto tablets and other smart devices in major app stores, like the Apple App Store.

27. TD SNAP was originally made available—and continues to be made available—independent of Tobii Dynavox's devices for two primary purposes: (a) as a tool for speech-language pathologists who are working with individuals to assess the most appropriate and compatible software based on each patient's communication needs prior to prescribing a device; and (b) as a resource for educators supporting students who may

benefit from a standalone version of the software to enhance communication and academic performance.

28.    To that end, TD SNAP offers a suite of page sets—collections of words, symbols, and pictures that facilitate efficient speech—for use by speech-language pathologists, educators, and patients. At present, TD SNAP currently offers a suite of eight different sets to facilitate communication.

29.    TD SNAP also comes with a series of tools that help improve the patient's experience. These include tools that allow for a user to customize his or her symbols for more efficient communication; a search tool that allows users to easily find the symbols they need; visual supports, such as calendars, timers, and scripts, that allow users to better self-regulate; and an integration with Google Assistant that allows individuals to control their environment (e.g., lighting and temperature adjustment) as well as to access information, music, weather, and more.

***Tobii Dynavox's Intellectual Property Rights in TD SNAP***

30.    Plaintiff Tobii Dynavox LLC was the sole owner of the trademark for TD SNAP, a wordmark registered as U.S. Trademark Registration No. 7,045,810 (the "'810 Registration").

31.    Plaintiff Tobii Dynavox LLC assigned the '810 Registration to Plaintiff Dynavox Group AB f/k/a Tobii Dynavox AB on or about August 3, 2023.

32.    Additionally, Plaintiff Dynavox Group AB f/k/a Tobii Dynavox AB is the sole owner of various copyrights for the visual features of the TD SNAP software,

including U.S. Copyright Registration Nos. TX 9-372-246, TX 9-372-037, and TX 9-372-555.

33.    The TD SNAP mark was first used in commerce in the United States in connection with software on July 1, 2021. The TD SNAP software offers a suite of page sets, all eye gaze, touch, and switch-enabled, to meet end-users' individual communication needs and preferences.

34.    The TD SNAP software is available for download without a prescription for a monthly subscription fee.

35.    As part of downloading the TD SNAP software, end-users and Tobii Dynavox enter into the TD SNAP License Agreement for Download (the "**EULA**"). A true and correct copy of the EULA is attached hereto as **Exhibit X**.[1]

36.    The EULA creates a limited, non-transferrable, non-exclusive, non-sublicensable license to install and use the TD SNAP software. *See* Ex. X at 1.

37.    The first paragraph of the EULA contains the end-user's agreement to be bound by the EULA's terms and conditions:

> PLEASE READ THIS SOFTWARE LICENSE AGREEMENT ("LICENSE") CAREFULLY BEFORE PURCHASING, INSTALLING, OBTAINING, AND/OR USING TD SNAP ("THE TOBII DYNAVOX SOFTWARE"). **BY PURCHASING, INSTALLING, OBTAINING, AND/OR USING THE TOBII DYNAVOX SOFTWARE, YOU ARE**

---

[1] Tobii Dynavox has updated its EULA multiple times including in 2021, 2023, and most recently on May 5, 2026. Exhibit X is a copy of Tobii Dynavox's 2026 EULA. The quoted language above is from the 2026 EULA and is functionally the same as that contained in earlier versions. *See, e.g.*, Exhibit Y (EULA effective as of August 3, 2023) and Exhibit Z (EULA effective as of July 1, 2021).  The restrictions discussed in this Complaint were at all times operative as to AbleNet.

**AGREEING TO BE BOUND BY THE TERMS OF THIS LICENSE. IF YOU DO NOT AGREE TO THE TERMS OF THIS LICENSE, DO NOT PURCHASE, INSTALL AND/OR USE THE SOFTWARE**.

*See* Ex. X, Preamble (capitalization in original, bold emphasis supplied).

38.     Although the EULA grants the end-user a license to use the TD SNAP software as noted above, the EULA also contains limitations on the manner in which TD SNAP software can be used. For example, the EULA provides:

> If You are a person or company downloading or otherwise making the Tobii Dynavox Software available for use on a device where the Tobii Dynavox Software will be resold, distributed, or otherwise put into commerce by virtue of being contained on a device for sale by You or otherwise, please be aware such actions are in violation of this License, and You are hereby put on Notice Your actions make you subject to legal reprimand, and expose You to liability for damages at law and equity.

Ex. X, General § 1 (emphasis in original).

39.     The EULA also contains important limitations on the use of the TD SNAP software. In pertinent part, it provides:

> The Tobii Dynavox Software, any third-party software, and any documentation, interfaces, content, fonts, symbols, and data accompanying this License whether in read-only memory, on any other media or in any other form (collectively all referred to herein as the "Tobii Dynavox Software") are owned by Dynavox Group AB and licensed not sold to you under the brand Tobii Dynavox for use only under the terms of this License. . . . Tobii Dynavox and/or Tobii Dynavox's licensors retain ownership of the Tobii Dynavox Software itself and reserve all rights not expressly granted to You herein. **You agree and accept that no ownership rights to the Tobii Dynavox Software are being transferred to You in any way, shape, or form.**

Ex. X, General § 2 (emphasis supplied).

40.     The EULA further contains the end-user's agreement not to engage in any attempts to circumvent the terms of the EULA:

> You may not rent, lease, lend, sell, sublicense or otherwise redistribute the Tobii Dynavox Software or exploit the Tobii Dynavox Software in any unauthorized way. You agree not to use the Tobii Dynavox Software in any manner to abuse, threaten or otherwise infringe or violate the rights of Tobii Dynavox or any other party, and You acknowledge that Tobii Dynavox is not in any way responsible for any such use by You. Except as expressly set forth herein, no portion of the Tobii Dynavox Software may be reproduced in any form or by any means.

*See* Ex. X, Usage Limitations § 3.

41.     The EULA contains a disclaimer in which Tobii Dynavox makes clear that if the end-user downloads Tobii Dynavox software from non-Tobii Dynavox sources, or loads the software on non-Tobii Dynavox devices, Tobii Dynavox cannot offer technical support for compatibility issues:

> If the Tobii Dynavox Software was installed on a non-Tobii Dynavox branded device, Tobii Dynavox expressly can not, does not, and will not offer technical support regarding compatibility issues which may occur between the Tobii Dynavox Software and the non-Tobii Dynavox branded device.

Ex. X, General § 4.

42.     Finally, the EULA gives Tobii Dynavox the right to terminate a license for violation of the terms of the EULA:

> This License is effective until terminated. Your rights under this License will terminate automatically or otherwise cease to be effective without notice from Tobii Dynavox if You fail to comply with any term(s) of this License. Upon the termination of this License, You shall cease all use of the Tobii Dynavox Software and destroy all copies, full or partial, of the Tobii Dynavox Software.

Ex. X, Termination.

## *Background on AbleNet*

43.   Defendant AbleNet holds itself out as an assistive-technology and special-education company headquartered in Roseville, Minnesota.

44.   AbleNet competes with Tobii Dynavox in the market for speech-related assistive technologies. However, unlike Tobii Dynavox, AbleNet does not offer its own, customizable assistive technology to its patients.

45.   Rather, AbleNet repackages hardware and software created by others—including Tobii Dynavox—and sells them under AbleNet's own brand names. These repurposed devices include the QuickTalker Freestyle, QuickTalker Freestyle Mini, QuickTalker FreeStyle Pro, and QuickTalker FreeStyle Touch (collectively, "QuickTalker").

46.   The QuickTalker is not a fully integrated speech-generating device.

47.   AbleNet does not manufacture the third-party speech-generating software that is added to the QuickTalker device.

48.   AbleNet does not install the speech-generating software applications needed for the devices to be useful to the individuals who are prescribed them.

49.   AbleNet does not have the ability to modify the third-party applications installed on its devices, or the application's source code once it is installed on an AbleNet device.

50.   AbleNet does not have the independent ability to provide customer support for the software applications downloaded by the individuals who purchase AbleNet devices.

51.     Notwithstanding that AbleNet's products are not integrated speech-generating devices, AbleNet misleads patients, speech language pathologists ("SLPs"), and private and public payors into believing that they are such devices by (a) providing the QuickTalker to patients pursuant to a prescription or order from a treating physician; and (b) having enrolled as a durable medical equipment, prosthetics, orthotics and supplies supplier in the Medicare program and state Medicaid programs, and participating in Medicare and Medicaid replacement plan networks, and with commercial payors.

### *AbleNet's Misconduct*

52.     As noted above, Tobii Dynavox and AbleNet compete in the marketplace for assistive devices throughout the United States.

53.     Rather than compete fairly, however, AbleNet has engaged in a brazen, years-long scheme to divert customers from Tobii Dynavox to AbleNet.

54.     Prior to May 2024, Tobii Dynavox made its TD SNAP app available to customers through the Apple App Store and other similar app marketplaces for a single, one-time fee.

55.     At that time, after payment and downloading, end-users would be granted a perpetual, non-transferable license to use the TD SNAP software.

56.     By 2022, however, Tobii Dynavox learned that AbleNet caused TD SNAP software licenses to be purchased through app marketplaces, loaded the TD SNAP software onto AbleNet devices, and then provided those devices to end users.

57.     This scheme benefited AbleNet because (a) it allowed AbleNet to capture sales it would have lost to Tobii Dynavox by deceiving end-users into believing that they

were receiving access to Tobii Dynavox's best-in-class software and support when they were not and (b) allowing AbleNet to freeload on Tobii Dynavox's software in violation of the EULA, which Tobii Dynavox developed and maintains at significant expense.

58.     AbleNet's benefits, and Tobii Dynavox's damages resulting from AbleNet's misconduct, are further compounded by the nature of the insurance reimbursement conditions for speech generating durable medical equipment.

59.     Specifically, durable medical equipment benefit insurance coverage for these products is typically provided for five years, which means that Tobii Dynavox may be subject to service requests from AbleNet customers for five years after they are diverted from a Tobii Dynavox product to an AbleNet product. Furthermore, during that five-year period, the patient is essentially locked into their AbleNet device and precluded from becoming a Tobii Dynavox patient.

60.     AbleNet's conduct has, at all times, violated the EULA because AbleNet's conduct resulted in a transfer of the license from AbleNet to the end-user without Tobii Dynavox's consent.

61.     Tobii Dynavox changed the payment terms for downloads of TD SNAP software through app stores to deter AbleNet's misconduct in or around May 2024.

62.     Namely, rather than charge a nominal single fee for a perpetual license as it had been doing, Tobii Dynavox offered two options: (a) its present monthly subscription model, which does not allow users to pre-purchase extended periods of access at one time; or (b) a significant single fee for a perpetual license.

63.     Undaunted by Tobii Dynavox's self-protective efforts, AbleNet developed additional countermeasures to continue exploiting Tobii Dynavox's software for its own benefit.  These schemes include, upon information and belief, shipping AbleNet devices to patients and providing them—and sometimes even their SLPs—with an Apple iTunes gift card to pay for access to TD SNAP.

64.     After shipping the device, AbleNet instructs patients (and sometimes their SLPs) on how to activate their AbleNet devices; how to use their own Apple ID account and the AbleNet-provided Apple iTunes gift card to purchase a TD SNAP software subscription; and how to download Tobii Dynavox's software on the AbleNet device.

65.     AbleNet has gone to great lengths to support its scheme. Understanding that Tobii Dynavox does not and would not provide technical support to AbleNet devices using the diverted TD SNAP software, AbleNet directs patients to *Tobii Dynavox's* web support library (called Learning Hub) and then further developed its own unauthorized library of support resources for TD SNAP.

66.     This library, referred to by AbleNet as its "SupportHub," includes resources explaining, among other things, how AbleNet customers can activate their TD SNAP subscriptions; set up their own "myTobiiDynavox" accounts (which are required for users to take advantage of TD SNAP's full functionality); and, directs customers to *Tobii Dynavox's* customer support materials and services for assistance activating the TD SNAP software.

67.     Upon information and belief, some of these materials provided by AbleNet on its "SupportHub" contain at least one Tobii Dynavox trademark – TD SNAP.

68.     AbleNet makes these resources available to its users on its SupportHub for the purpose of giving the appearance of a direct commercial relationship between AbleNet and Tobii Dynavox for the TD SNAP software, even though AbleNet is well aware that no such relationship exists.

69.     At no point has AbleNet obtained a license from Tobii Dynavox to load Tobii Dynavox products onto AbleNet devices, and AbleNet violates Tobii Dynavox's EULA by its schemes to circumvent Tobii Dynavox's license requirements, including by supplying cash-equivalent gift cards worth hundreds of dollars to end-users.

### *AbleNet's Harm to Tobii Dynavox*

70.     AbleNet's diversion of Tobii Dynavox's customers to AbleNet has caused severe damage to Tobii Dynavox in the form of lost sales and unquantifiable lost good will in the marketplace.

71.     The economic damage wrought by AbleNet's misconduct has been extremely harmful to Tobii Dynavox's financial performance. Each purchase of an AbleNet device for use with a TD SNAP software subscription costs Tobii Dynavox the sale of one of its own devices.

72.     AbleNet's conduct has also harmed Tobii Dynavox's standing in the marketplace because customers who purchase AbleNet's products for use with TD SNAP software are deceived by AbleNet into believing that they are receiving a Tobii Dynavox product and Tobii Dynavox's customer support.

73.     Not so. As noted above, AbleNet and Tobii Dynavox have no license agreement that would permit AbleNet to exploit Tobii Dynavox's TD SNAP software.

When customers seek technical or other support from Tobii Dynavox for their TD SNAP software on AbleNet devices, Tobii Dynavox can provide only limited support. This, in turn, causes consumer frustration and tarnishes Tobii Dynavox's brand in the marketplace.

74. Tobii Dynavox has repeatedly requested that AbleNet cease and desist from unfairly competing, including as far back as January 2022. But AbleNet persists, despite actual knowledge of its misconduct.

75. Tobii Dynavox sent its first cease-and-desist letter to AbleNet on January 26, 2022. In that correspondence, Tobii Dynavox informed AbleNet that it was aware that AbleNet was selling AbleNet devices preloaded with TD SNAP software without Tobii Dynavox's consent and in violation of Tobii Dynavox's intellectual property rights. Tobii Dynavox demanded that AbleNet stop, but it refused.

76. AbleNet's malfeasance continued. On April 5, 2024, Tobii Dynavox sent another letter to AbleNet, demanding that AbleNet cease-and-desist from downloading TD SNAP software from the Apple Store onto AbleNet devices for patients pursuant to sham "agency agreements." AbleNet once again refused.

77. Tobii Dynavox sent a third cease-and-desist letter on April 26, 2024, reiterating its demands.

78. Evidently unwilling or unable to compete fairly, AbleNet switched tactics to a new variant of its scheme. Namely, since some time after Tobii Dynavox again demanded that AbleNet stop violating its license agreements, AbleNet began to provide consumers who purchased their devices with an Apple gift card so that the customer, with AbleNet's

close support, could pay for the subscription and download the TD SNAP software onto the AbleNet device themselves, thereby concealing AbleNet's role.

79.    Through all the variants of AbleNet's misconduct, Tobii Dynavox has received and continues to receive customer service inquiries and complaints regarding the functionality of TD SNAP software on AbleNet's devices.

80.    To date, AbleNet has refused to comply with Tobii Dynavox's demands that AbleNet cease and desist from its misconduct.

## COUNT 1
## Tortious Interference with Economic Relations

81.    Tobii Dynavox incorporates each of the preceding paragraphs 1 through 80 as if fully set forth herein.

82.    By virtue of the EULA, Tobii Dynavox has a contractual relationship with customers who download the TD SNAP app. *See* Ex. X.

83.    At all times, AbleNet has been aware of the existence of the EULA between Tobii Dynavox and customers who download TD SNAP.

84.    AbleNet has acted purposefully and intentionally to harm the contractual relationship between Tobii Dynavox and its customers created by the EULA by, amongst other things, (a) inducing TD SNAP software's customers to breach the terms of the EULA by loading TD SNAP on their AbleNet devices; (b) paying TD SNAP subscription fees for AbleNet customers; (c) deceiving would-be Tobii Dynavox customers into believing that Tobii Dynavox permits the use of its software on AbleNet-distributed devices; and (d)

-17-

providing unauthorized technical support resources to individuals who download TD SNAP software onto their AbleNet-distributed devices.

85.    AbleNet's interference with the contractual relationship between Tobii Dynavox and customers of the TD SNAP software is improper and without justification or privilege as it extends well-beyond the acceptable bounds of competition, in light of AbleNet's severe misconduct; its profit-at-all-costs motive; the importance of protecting Tobii Dynavox's property and contractual rights, which are advanced by the EULA; and the absence of any social interest in protecting or justifying AbleNet's actions.

86.    AbleNet's interference with Tobii Dynavox's contractual relationships with the users of TD SNAP software has caused severe harm to Tobii Dynavox in the form of lost Tobii Dynavox device sales; loss of Tobii Dynavox's investment in its own hardware and software; and, the loss of goodwill among the patients in need of assistance technologies and the healthcare professionals who prescribe and order them.

### Count 2
### Violation of the Minnesota Uniform Deceptive Trade Practices Act
### Minn. Stat. § 325D.43, *et seq.*

87.    Tobii Dynavox incorporates each of the preceding paragraphs 1 through 86 as if fully set forth herein.

88.    Pursuant to Minn. Stat. § 325D.44, subd. 1, a person engages in a "deceptive trade practice," when, "in the course of business, vocation, or occupation," the person, *inter alia*:

  a.  Passes off goods or services as those of another, *see* Minn. Stat. § 325D.44, subd. 1(1);

b. Causes likelihood of confusion or misunderstanding as to the source of goods or services, *see* Minn. Stat. § 325D.44, subd. 1(2);

c. Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification, by another, *see* Minn. Stat. § 325D.44, subd. 1(3);

d. Represents that goods or services have sponsorship or approval that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have, *see* Minn. Stat. § 325D.44, subd. 1(5);

e. Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, *see* Minn. Stat. § 325D.44, subd. 1(7);

f. Disparages the goods, services, or business of another by false or misleading representation of fact, *see* Minn. Stat. § 325D.44, subd. 1(8);

g. Engages in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices, *see* Minn. Stat. § 325D.44, subd. 1(13); and,

h. Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding, *see* Minn. Stat. § 325D.44, subd. 1(14).

89. As described in detail above, AbleNet knowingly and willfully engaged in one or more deceptive trade practices in the course of its business, vocation, or occupation in violation of Minn. Stat. § 325D.44, subd. 1.

90. By way of illustrative examples, AbleNet has, upon information and belief, engaged in at least the following deceptive trade practices:

i. Passed off AbleNet's products and services as those of Tobii Dynavox;

j. Caused confusion or misunderstanding as to the source of AbleNet's products or services;

k. Caused confusion or misunderstanding as to AbleNet's affiliation, connection, or association with, or certification by, Tobii Dynavox;

l.  Represented that AbleNet's products or services have the sponsorship or approval of Tobii Dynavox, even though Tobii Dynavox has not sponsored, approved, affiliated with, or maintained any other connection with AbleNet;

m.  Represented that AbleNet's products or services are of a particular standard, quality, or grade—i.e., up to par with Tobii Dynavox's products and services, even though AbleNet's products and services are inferior;

n.  Disparaged Tobii Dynavox's products, services, or business by falsely or misleadingly representing a fact, namely that Tobii Dynavox in some way approves, sponsors, sanctions, or supports AbleNet's products or services;

o.  Engaged in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices; and,

p.  Engaged in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

91.  As a result of its misconduct, AbleNet is liable to Tobii Dynavox for AbleNet's violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*

92.  AbleNet has engaged in unfair trade practices willfully and with knowledge that its conduct was deceptive as evidenced by, amongst other things, the multiple cease-and-desist letters that Tobii Dynavox issued to AbleNet concerning its misconduct.

93.  As a result of AbleNet's deceptive trade practices, AbleNet has caused, and will continue to cause, severe harm to Tobii Dynavox in the form of lost Tobii Dynavox device sales; loss of Tobii Dynavox's investment in its own hardware and software; the loss of goodwill amongst the patients in need of assistance technologies and the healthcare professionals who prescribe them; lost revenues and profits; and in other ways to be proven at trial.

**Count 3**
**Federal Common Law Trademark Infringement**
**15 U.S.C. § 1125(a) (Section 43(a) of the Lanham Act)**

94.    Tobii Dynavox incorporates each of the preceding paragraphs 1 through 93 as if fully set forth herein.

95.    AbleNet has adopted and is using the TD SNAP trademark, or colorable imitations thereof, in commerce to promote and advertise AbleNet's products to the consuming public.

96.    The TD SNAP trademark is inherently distinctive, and by virtue of Tobii Dynavox's longstanding use and promotion of the TD SNAP trademark, the mark has acquired distinctiveness.

97.    AbleNet's use of the TD SNAP trademark, or colorable imitations thereof, is likely to, and has and will continue to cause confusion.

98.    By using and incorporating the TD SNAP trademark, or colorable imitations thereof, on its products, services, website and/or in other marketing materials, AbleNet has confusingly led consumers away from Tobii Dynavox's legitimate products and services.

99.    Unless enjoined by this Court, this consumer confusion has and will continue to damage, erode, and tarnish Tobii Dynavox's name, reputation, goodwill, and identity, as well as the goodwill in the TD SNAP trademark.

100.    Tobii Dynavox has been damaged as a result of AbleNet's conduct. Such damages include, but are not limited to, lost Tobii Dynavox device sales; loss of Tobii Dynavox's investment in its own hardware and software; damage to Tobii Dynavox's goodwill and reputation and the goodwill and reputation of the TD SNAP trademark,

including loss of control of said trademark; lost revenues and profits; and other damages to be proven at trial.

## Count 4
## Federal Trademark Infringement
## 15 U.S.C. § 1114 (Section 32 of the Lanham Act)

101. Tobii Dynavox incorporates each of the preceding paragraphs 1 through 100 as if fully set forth herein.

102. Tobii Dynavox owns all rights, title, and interest in the '810 Registration.

103. AbleNet has improperly and willfully adopted and is using the Tobii Dynavox mark or colorable imitations thereof on its website, social media, and other marketing materials to promote and advertise its products and services to the consuming public.

104. AbleNet's use of the TD SNAP trademark, or colorable imitations thereof, is likely to, has, and will continue to cause consumer confusion.

105. AbleNet's use in interstate commerce of the TD SNAP trademark covered by the '810 Registration is likely to cause confusion or deception of consumers as to the source, origin, or sponsorship of relevant products in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

106. AbleNet's conduct constitutes trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

107. As a direct and proximate result of AbleNet's conduct, Tobii Dynavox has been, and is likely to continue to be, substantially injured in its business, including lost Tobii Dynavox device sales; loss of Tobii Dynavox's investment in its own hardware and

software;  harm to Tobii Dynavox's goodwill and reputation, harm to the goodwill and reputation of the TD SNAP trademark, the loss of revenues and profits; and other damages to be proven at trial.

108.   Tobii Dynavox has no adequate remedy at law and, unless enjoined by this Court, AbleNet will continue to engage in acts of trademark infringement to the irreparable damage and injury of Tobii Dynavox.

109.   Upon information and belief, AbleNet has engaged in the above-referenced acts of trademark infringement with full knowledge of Tobii Dynavox's exclusive rights in the '810 Registration, and AbleNet continues such acts of intentional infringement, thus making this case exceptional and entitling Tobii Dynavox to an award of treble their actual damages, plus attorneys' fees in bringing and maintaining this action.

### Count 5
### Unjust Enrichment

110.   Tobii Dynavox incorporates each of the preceding paragraphs 1 through 109 as if fully set forth herein.

111.   AbleNet has unjustly benefitted as a result of Tobii Dynavox's significant investment of time, energy, and resources into researching, developing, manufacturing, testing, promoting, and servicing its TD SNAP software and assistive devices.

112.   AbleNet has reaped the benefits of Tobii Dynavox's significant investment into its technology and devices by selling AbleNet assistive devices to would-be Tobii Dynavox customers by creating the false impression that AbleNet is affiliated with Tobii

Dynavox, or otherwise entitled to support the use of Tobii Dynavox's software on AbleNet devices.

113.   Having traded on Tobii Dynavox's goodwill and strong reputation in the marketplace, and in light of its deception of would-be Tobii Dynavox customers and their treating providers, it would be inequitable for AbleNet to continue to retain the millions of dollars in financial benefit it has reaped from its misconduct.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiffs Dynavox Group AB f/k/a Tobii Dynavox AB, and Tobii Dynavox LLC respectfully request that the Court enter judgment in their favor and against Defendant AbleNet, Inc. as follows:

A.   Entry of a judgment adjudicating that:

   a.   AbleNet's conduct constitutes tortious interference with Tobii Dynavox's contracts;

   b.   AbleNet knowingly and willfully engaged in deceptive trade practices prohibited by the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

   c.   AbleNet has willfully and deliberately infringed Tobii Dynavox's common law and federally registered trademark rights in the '810 Registration; and

   d.   AbleNet has been unjustly enriched by virtue of its misconduct;

B.   Entry of a permanent injunction enjoining AbleNet and its employees, agents, partners, officers, directors, owners, shareholders, principles, subsidiaries, related companies, affiliates, distributors, dealers and all persons in active concert or participation with any of them from:

   a.   using, in any manner, any of Tobii Dynavox's trademarks or service marks in violation of their protected rights; and

b.    continuing to engage in any deceptive trade practices prohibited by the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*;

C.    Entry of a mandatory injunction directing AbleNet to:

a.    destroy all products, signage, advertisements, promotional materials, stationery, forms and any other materials and things that contain or bear Tobii Dynavox's marks, whether in electronic form or hard copy;

b.    engage in corrective advertising in a manner directed by the Court;

c.    pay Tobii Dynavox the cost for its corrective advertising in an amount to be determined by the Court; and

d.    file with this Court and serve on Tobii Dynavox's attorneys an affidavit setting forth in detail the manner and form in which AbleNet has complied with the injunction within thirty (30) days after the entry of the order;

D.    Entry of judgment:

a.    Awarding Tobii Dynavox such actual damages that it has sustained from AbleNet's foregoing acts or disgorgement of AbleNet's profits, and increasing such profits, in accordance with 15 U.S.C. § 1117 and other applicable laws;

b.    Awarding Tobii Dynavox such statutory damages as are recoverable in accordance with 15 U.S.C. § 1117 in an amount no less than $1,000 and no more than $100,000 per domain registered in violation of 15 U.S.C. § 1125(d); and

c.    Awarding Tobii Dynavox damages in an amount as yet undetermined caused by the foregoing acts, and trebling such damages in accordance with 15 U.S.C. § 1117 and other applicable laws;

E.    Compensatory damages and/or disgorgement of AbleNet's profits;

F.    Restitution;

G.    Pre- and post-judgment interest;

H.    Reasonable attorneys' fees and costs, including reasonable attorneys' fees under 15 U.S.C. § 1117 given the exceptional nature of this case; and

I.    Such other and further relief as the Court deems just and proper.

**Respectfully submitted,**

DATED: May 20, 2026

**GREENE ESPEL PLLP**

s/Jeanette M. Bazis
Jeanette M. Bazis (Reg. No. 0255646)
222 S. 9th Street, Suite 2200
Minneapolis, MN 55402
jbazis@greeneespel.com
T: (612) 373-0830

**DLA PIPER LLP (US)**

Whitney C. Cloud (*Pro Hac Vice* Forthcoming)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
whitney.cloud@us.dlapiper.com
T: (215) 656-3300
F: (214) 656-3301

Brett M. Feldman (*Pro Hac Vice* Forthcoming)
1251 Avenue of the Americas, Floor 27
New York, New York 10020
brett.feldman@us.dlapiper.com
T: (212) 335-4500
F: (212) 335-4501

*Attorneys for Plaintiffs Dynavox Group AB f/k/a
Tobii Dynavox AB, and Tobii Dynavox LLC*